ELIZABETH A. SPERLING - State Bar No. 231474
esperling@glaserweil.com
ALINA GATTO - State Bar No. 341169
agatto@glaserweil.com
**GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP**
600 W. Broadway, Suite 2850
San Diego, CA 92101
Telephone: (619) 765-4380
Facsimile: (619) 732-3498

Attorneys for Plaintiff
VARADARAJAN DWARAKANATH

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

VARADARAJAN DWARAKANATH,

Plaintiff,

v.

VAIDYAJI PRIYANKA, AKA PRIYA RAVI, AKA PRIYA GANESH RAVI, AKA PRIYANKA VAIDYA, an individual; AUM AYURVEDA, d/b/a AUM CUISINE, d/b/a AUMCUISINE, d/b/a AUM VEDIC WELLNESS, a business of unknown type or origin; and DOES 1-50, inclusive,

Defendants.

CASE NO.: 5:25-cv-06465-PCP

**FIRST AMENDED COMPLAINT FOR:**

**(1) RICO**
**(2) FRAUD**
**(3) CONSTRUCTIVE FRAUD**
**(4) NEGLIGENT SUPERVISION**
**(5) CONVERSION**
**(6) THEFT BY FALSE PRETENSES**
**(7) UNFAIR COMPETITION**

**DEMAND FOR JURY TRIAL**

Glaser Weil

Plaintiff Varadarajan Dwarakanath ("Plaintiff") hereby brings this Complaint against Defendants Vaidyaji Priyanka aka Priya Ravi aka Priya Ganesh Ravi aka Priyanka Vaidya ("VP"), AUM Ayurveda d/b/a AUM Cuisine, d/b/a AUMCuisine, d/b/a AUM VEDIC WELLNESS (collectively "AUM"), and Does 1-50 (collectively, "Defendants"), and alleges and states as follows:

## **INTRODUCTION**

1. This is an action for (1) violations of RICO; (2) fraud; (3) constructive fraud; (4) negligent supervision; (5) conversion; (6) theft by false pretenses; and (7) violation of California's Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200 *et seq*.

2. This case involves a cult, AUM Ayurveda, which is run by VP, the cult leader, and her associates. Through a complex scheme and pattern of manipulation, brainwashing, and quite possibly drugging, the cult has destroyed Plaintiff's family and forcibly separated his two young daughters from their father.

3. A cult is defined by the APA Dictionary of Psychology[1] as "a religious or quasi-religious group characterized by unusual or atypical beliefs, seclusion from the outside world, and an authoritarian structure. Cults tend to be highly cohesive, well organized, secretive, and hostile to nonmembers." As set forth below, AUM Ayurveda exhibits all of these characteristics, as it seeks to seclude its members from the outside world using control tactics and preventing its members from sharing details about their lives with family members.

4. Hallmarks of a cult and cult leader include[2]:

a) Isolating members and penalizing them for leaving

b) Seeking inappropriate loyalty to their leaders

c) Dishonoring the family unit

---

[1] APA Dictionary of Psychology at https://dictionary.apa.org/cult.

[2] See *Cult-Related Activity,* Cookman University, at https://www.cookman.edu/crl/cult-related-activity.html.



Glaser Weil

d) Absolute authoritarianism without meaningful accountability

e) No tolerance for questions or critical inquiry

f) No meaningful financial disclosure regarding budget, expenses such as an independently audited financial statement

g) Unreasonable fear about the outside world, such as impending catastrophe, evil conspiracies, and persecutions

h) There is no legitimate reason to leave, former followers are always wrong in leaving, negative or even evil

i) Followers feel they can never be "good enough"

j) The group/leader is always right

k) The group/leader is the exclusive means of knowing "truth" or receiving validation, no other process of discovery is really acceptable or credible

5. AUM Ayurveda fits all of these factors as a cult and VP fits all of these factors as a cult leader.

6. AUM Ayurveda and VP isolate their clients, who they later turn into Members (followers of the cult who are loyal to VP and AUM and participate in recruitment to the cult) by taking children away from their loving parents, discouraging sharing details about the cult with the outside world, extracting as much money from its Members as possible, and isolating Members by turning them against anyone who questions the cult or its leader.

7. AUM Ayurveda seeks inappropriate and undivided loyalty to VP from its Members by idolizing her as a divine figure who has special healing powers and divine abilities and insight and manipulates Members into believing she is the only authority on their healing and/or mental or physical health. This encourages Members to stop seeing or following the advice of other health professionals or taking medication or prescribed treatment other than what is provided or prescribed by AUM and VP.

8. AUM Ayurveda and VP dishonor the family unit by taking children away



Glaser Weil

from their parents, spreading harmful lies about family members, implanting false memories about abuse, and instilling manufactured urges and beliefs. They have done all of this to Plaintiff's family.

9. AUM Ayurveda and VP create a system of absolute authoritarianism without meaningful accountability by blaming any problems or setbacks in a Member's life on the Member or outsiders rather than on AUM Ayurveda or VP's treatment, and if anyone pushes back or criticizes AUM or VP they are punished by having harmful lies spread about them.

10. AUM Ayurveda and VP have zero tolerance for questions or criticisms. As outlined below, once Plaintiff began questioning AUM Ayurveda's and VP's tactics, the cult began to turn his children against him by spreading harmful lies to them and others and further isolating the children from their father.

11. AUM Ayurveda and VP have no meaningful disclosure of their finances, and instead charge arbitrary amounts for their services in order to enrich their leaders. As set forth in more detail below, Members are forced to pay exorbitant amounts for spiritual readings, poojas, yagyas/yagnas, evil spirit warding instruments (yantras), jewelry, clothes, trips, foods and healthy snacks, herbs, treatments, and other expenses in order to avoid purported harm to them or their family, without any transparency into why these services cost so much or where the money goes.

12. AUM Ayurveda and VP create an unreasonable fear in their Members about the outside world by spreading falsehoods about family members and other outsiders. They make Members feel that AUM Ayurveda is the only safe place to receive mental or physical health treatments and discourage the use of other resources, including conventional medicine.

13. AUM Ayurveda and VP discourage leaving the cult and demonize those who do. For example, once Plaintiff began to realize the warning signs that this is a cult, AUM Ayurveda and VP began to turn his family against him and spread lies about him and his father in order to demonize him for leaving. VP motivated Plaintiff's wife



Glaser Weil

to divorce him, using fake divinations from her deceased father in order to manipulate her.

14. AUM Ayurveda and VP make their followers feel as though they can never be good enough and always require further treatment, which of course results in more money for the cult. They blame Members for issues in their lives rather than admit that their spiritual readings and treatment are not effective as advertised.

15. AUM Ayurveda and VP make their Members believe that they are always right by manipulating Members into believing that the choices VP makes for them are beneficial and correct, and any criticism is discouraged. For example, as outlined below, VP will choose Members' jewelry, clothing, and what books to read, and does not allow outside input on these matters. She even instructs Members on what colors to wear on particular days. Members are brainwashed to believe she is psychic or divinely blessed as details they previously shared with her appear in subsequent spiritual readings they receive.

16. Finally, AUM Ayurveda and VP make their Members believe that the cult and VP are the only way to receive the "truth" or validation. As outlined below, AUM Ayurveda and VP discourage their Members from receiving treatment from actual mental health professionals or physicians and manipulate them into believing the cult is the only way they can achieve a better life.

17. S.S.[3] has been married to Plaintiff since 2003. They reside in Texas. Together they share two daughters, K.D., who recently turned eighteen, and M.D., who is still a minor. Plaintiff initiated divorce proceedings against S.S. in Texas in June 2025 after he realized the devastation caused by the cult to his family. He realized that AUM Ayurveda and VP had brainwashed him, S.S., and his daughters. Once he began questioning things and stepping back from the cult, AUM Ayurveda and VP began turning against him.

---

[3] The Court has ruled that Plaintiff's family members should be referred to by their initials.

18. In the Texas divorce proceeding, the judge issued a temporary restraining order and order setting a hearing for temporary orders, among other things, restraining the parties from disturbing the peace of M.D. and hiding or secreting M.D. from the other. Following a hearing in August 2025, the Texas Court issued an order granting primary custody of both K.D. (who was still a minor at the time) and M.D. to Plaintiff and ordered S.S. to deliver the children to him on August 12, 2025, because the family court had "concerns for the health and safety of the children in the mother's care."

19. S.S. repeatedly violated the Court's orders requiring S.S. to return the children, forcing Plaintiff to file and the Court to grant verified petitions for a writ of habeas corpus on several occasions, including September 16, 2025, September 23, 2025, November 4, 2025, and December 12, 2025. Each time, despite the Court ordering S.S. to produce the children in court by a specific date, S.S. refused to obey the Court's orders and has improperly retained custody of the young girls. S.S. ran out the clock on K.D., who is now 18.

20. Plaintiff strongly believes that Defendants have been behind all of this, assisting and advising S.S. in violating the court's orders and with all aspects of her custody and divorce cases against Plaintiff.

21. In addition, in a desperate attempt to resist the family court's order granting full custody of the two girls to Plaintiff, and in retaliation for Plaintiff filing the present action that exposes AUM Ayurveda and VP as a dangerous cult, S.S., K.D., and M.D. have filed a number of frivolous domestic violence restraining order applications against Plaintiff in Texas and in San Jose. The Courts have denied or dismissed all of their applications to date, confirming they are meritless. At least one court noted that the timing of these applications is suspicious given the ongoing litigation.

22. Plaintiff strongly believes that Defendants have been behind all of this as well, with Defendants' counsel even attending the domestic violence restraining order hearings.

23. VP received word that Plaintiff was prepared to file the instant lawsuit against her the week of July 21st, 2025. S.S. then filed CPS reports regarding alleged abuse of her daughters by Plaintiff and his father on July 23, 2025, July 29, 2025, and two reports on July 30, 2025. These slanderous, false reports alleged abuse that had supposedly occurred many years prior but were just made for the first time after VP learned she was about to be exposed.

24. All of these reports were closed by the authorities without requiring further investigation because they so obviously lacked merit. The timing of these sudden false reports and filings reveals that it is Defendants who are behind them and who are using S.S. and the two girls as weapons in their war against Plaintiff.

25. K.D. allegedly saw a therapy intern located in Pismo Beach, CA, several hours away from where K.D. was residing in San Jose, via a remote appointment in July 2025, after VP learned that this lawsuit was being filed. In that Zoom session, K.D. claimed for the first time, despite receiving years of therapy previously, that she had been abused by her father and grandfather. The therapy intern filed a CPS report reflecting the false accusations of abuse that supposedly had occurred many years prior. This report was never given any serious credence by CPS, because it is an obviously manufactured report. Given the timing, it is apparent to Plaintiff that Defendants were behind this.

26. Notably, despite VP's claims for the first time as early as May 2025 that K.D. and M.D. were victims of molestation by their grandfather, no CPS report was ever filed by anyone until the week VP learned that Plaintiff planned to file a lawsuit.

27. Quite tellingly, right after Plaintiff filed this lawsuit in July 2025, S.S. filed several reports with the Texas Department of Family and Protective Services on behalf of K.D. and M.D. alleging abuse by Plaintiff and his father, none of which have been recommended for investigation. Yet they continue to file serial false reports and accusations against Plaintiff and his father.

28. At the same time, beginning in July 2025, S.S. also started filing false,

fraudulent, and slanderous police reports with the Los Altos and Houston Police Departments, accusing Plaintiff and his father of horrible crimes, all of which have been dismissed and not pursued by either Police Department because they lack merit.

29. In connection with these numerous false reports, K.D. threatened to go to Plaintiff's temple and provide a recorded interview defaming him before his entire temple with the story of her alleged abuse. Plaintiff strongly believes that Defendants have been behind all of this as well – orchestrating it, planting the false memories of abuse, prompting and encouraging these actions, and facilitating these efforts.

30. In August 2025, after the filing of this lawsuit, an anonymous letter was also mailed to Plaintiff's supervisor at his workplace, repeating the same defamatory accusations of abuse. Only S.S. knows Plaintiff's supervisor. Plaintiff strongly believes that Defendants were behind this and committed this outrageous act of slander and defamation directly or by using S.S. or another Member.

31. As recently as January 2026, on several occasions letters allegedly written by K.D. were sent to Plaintiff's friends, repeating the same defamatory accusations of abuse by Plaintiff and his father. These letters used the same font and formatting as the defamatory letter sent to Plaintiff's supervisor, making it obvious they all came from the same source.

32. S.S. and Plaintiff's daughters never made any of these disgusting allegations of abuse until after VP received word of this lawsuit. Only after that did all of this gross and outrageous harassment, slander, and defamation begin.

33. Because Plaintiff believes that VP is still very much controlling and influencing S.S. and his daughters, on information and belief, VP, AUM, and their Members have encouraged, facilitated, assisted, and used S.S. and Plaintiff's daughters to make these false statements and disseminate them to third parties. Defendants have weaponized their manufactured allegations of abuse and caused tremendous damage to Plaintiff.

34. On information and belief, Defendants and their Members devised,



Glaser Weil

facilitated, and orchestrated all of these activities, including the fraudulent CPS and police reports as well as the defamatory letters, as part of their fraudulent RICO enterprise. Defendants used the mail and wires to commit and perpetuate their fraudulent activities.

35. The counterfeit and fraudulent police reports, CPS reports, domestic violence reports, restraining order applications, and anonymous defamatory letters constitute multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in furtherance of the RICO enterprise.

36. Ever since S.S. became entrenched in the cult in 2022, its leader VP and her associates have controlled every aspect of the children's lives, forcing them to move across the country, forcing them to change schools, isolating them from their friends and family, changing their plans for the future, and dictating every major aspect of their lives including what they may eat, where they live, who they may speak with, where they may apply to college, and where they must go to school.

37. The cult and its Members have had exclusive custody and control over K.D. since 2023, not allowing her to return home to Texas or to speak with or see her father since then. The cult has dictated where she goes to school (despite a court ruling that Plaintiff has sole discretion regarding his children's education), refused to allow her father to attend her graduation, and placed her in the home of a non-relative male selected by the cult for care and custody.

38. The cult, VP and AUM, as well as their Members, have implanted terrible accusations and ideas of homicide, suicide, and molestation in the minor children's minds, causing them to accuse family members of heinous crimes. The cult has performed various measures to "convert" or "cure" one of Plaintiff's daughters from being queer or lesbian.

39. Yet S.S., in her Texas filing, counter-suing Plaintiff for divorce and seeking custody of the daughters, falsely asserted that both daughters have resided continuously with her in Texas and that they only relocated temporarily to San Jose,

CA "solely" to attend the 2025-2026 school year. This is false, as the elder daughter has been forcibly kept away from her father in California since 2023. She graduated from high school in San Jose, CA in 2025.

40. S.S. also falsely asserts in her Texas filing that the children are in the care of relatives, S.S.'s sister (referred to herein as "Sister-in-Law" or "SIL"), S.S.'s brother, (referred to herein as "Brother-in-Law" or "BIL"), and a male associate of the cult, Gautam Kumaran. This is also untrue and Gautam Kumaran is not a relative.

41. The cult has fraudulently extracted over $722,000 from Plaintiff over the last few years through manipulation and misrepresentations after convincing Plaintiff that his daughters needed specialized mental health treatment that could only be provided by the cult in California, far away from the children's home in Texas.

42. This lawsuit is intended to hold the leader and associates of this cult accountable for the damage they have caused in destroying this family, as well as the significant funds they fraudulently siphoned from Plaintiff.

Glaser Weil

## THE PARTIES

43. Plaintiff is an individual, over the age of eighteen, who resides in the County of Harris, State of Texas.

44. Plaintiff is informed and believes, and on that basis alleges, that Vaidyaji Priyanka aka Priya Ravi aka Priya Ganesh Ravi aka Priyanka Vaidya ("VP") is an individual, over the age of eighteen, who resides in the County of Santa Clara, State of California.

45. Plaintiff is informed and believes, and on that basis alleges, that AUM is a business entity of unknown type or origin with its principal place of business at 3272 Carol Leaf Court, San Jose CA, in the County of Santa Clara, State of California.

46. Plaintiff is informed and believes, and on that basis alleges, that at all times relevant hereto, there has existed a unity of interest and ownership between VP and AUM such that any individuality and separateness between VP and AUM has ceased and AUM is nothing more than a shell entity acting as the alter ego of VP.

47. Plaintiff is informed and believes, and on that basis alleges, that adherence to the fiction of the separate existence of VP, on the one hand, and AUM, on the other, as distinct from one another would permit an abuse of the corporate privilege and would sanction fraud or promote injustice.

48. Plaintiff is informed and believes, and on that basis alleges, that VP used the corporate form of AUM to perpetrate fraud, circumvent statutory law, and accomplish a wrongful and inequitable purpose. As described in greater detail below, VP uses AUM to indoctrinate clients into a cult and extort exorbitant sums from the clients, using the mail and wires and other electronic means, including crossing state lines, under the guise of holistic therapy. In this manner, VP uses AUM as a subterfuge for illegal transactions.

49. Under these circumstances, the Court should ignore the corporate entity under the alter ego doctrine and deem AUM's acts to be those of VP who actually controls the corporation.

50. The cult Members of AUM, including S.S., SIL, BIL, Richard Walters, and Gautam Kumaran, are agents of AUM and supervisees of VP and act under their control to further AUM and VP's fraudulent scheme.

51. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 50, inclusive (individual, a "Doe Defendant" and collectively, "Doe Defendants"), are unknown to Plaintiff at this time, and Plaintiff, therefore, sues Doe Defendants by such fictitious names. Plaintiff will ask leave of Court to amend this Complaint when the same shall have been ascertained. Plaintiff is informed and believes, and on that basis alleges, that each Defendant was responsible intentionally, or in some other actional manner for the events and happenings referred to herein, which proximately caused injury and damage to Plaintiff, as hereafter alleged.

52. Any reference to Defendants shall refer to each named Defendant and all Doe Defendants and to each of them. Any reference to a particular Defendant shall refer to the named Defendant only.

53. Defendants are responsible for their acts and for their conduct, which are the true legal causes of the damages herein alleged.

**JURISDICTION AND VENUE**

54. This is an action for Racketeer Influenced & Corrupt Organization Act (RICO) violations pursuant to 18 U.SC. §§ 1341, 1343, and 1964. Federal subject matter jurisdiction as to these claims is conferred on this Court under 28 U.S.C. §§ 1331.

55. The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states. Personal jurisdiction as to these Defendants is proper in this Court because Defendants are either citizens or residents of the State of California and/or their contacts and conduct within the State are systematic and continuous within California.

56. Venue is proper in the Northern District of California under 28 U.S.C. § 1391 as Defendants have their principal place of business and/or reside in this district. Moreover, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and Plaintiff has been injured in this district.

57. This case is assigned to the San Jose district pursuant to L.R. 3-2(e) because it arises in the County of Santa Clara.

**BACKGROUND ON THE AUM AYURVEDA CULT**

58. VP is the leader of AUM, an organization that claims to specialize in holistic therapy and Ayurvedic medicine, including "healing" massages, various health supplements, and alternative treatments.

59. Under the direction and supervision of VP, VP's associates provide "healing" massages and other services for AUM clients. These associates include, on information and belief, but are not limited to, Gautam Kumaran, Nancy Nardona, Marc (last name unknown), Belinda (last name unknown), Richard Walters and others.

60. Despite AUM's public presentation of positivity and healing, in reality it is a nefarious cult that manipulated and influenced Plaintiff to relinquish his parental



Glaser Weil

rights over his two young daughters. AUM and VP swindled Plaintiff out of over $722,000 under the guise of providing physical and mental health treatment to his daughters.

61. AUM operates through a web of various subsidiaries of unknown business types, including AUM Cuisine, which sells foods advertised as healing and with anti-aging properties, and AUM Sacred Art, LLC, which sells jewelry to prevent the wearer from being the victim of evil spells or negative energy. At all relevant times, VP and AUM, and these subsidiaries operated as a single integrated business enterprise, led by VP, and each were alter egos of each other.

62. As just one example of exorbitant charges for the services offered by these subsidiaries, VP charges $360 for a 30 minute consultation to "heal people with crystals and gemstones with the most authentic Vedic modality." As part of this consultation, VP obtains guidance from a spiritual master she calls "Gemmie" to help her select the gemstones for her clients.

63. AUM uses its various subsidiaries to attract and indoctrinate extremely vulnerable clients in need of guidance and healing and convinces them to pay exorbitant sums for products and services. These desperate and vulnerable people pay vast sums of money to AUM for healing but the products and services advertised are snake oil — they fail to provide the advertised benefits, inevitably forcing clients to purchase additional services or products in further, desperate attempts to achieve the advertised benefits.

64. VP establishes her own legitimacy by claiming to Plaintiff and other potential clients that she has multiple degrees in business, medicine, and Ayurvedic medicine, from prestigious institutions like Kings College in London and Columbia University. She has held herself out to Plaintiff and others as a medical doctor; she purports to provide mental health therapy, diagnoses, and treatments; she has instructed Plaintiff and other clients to bring their prescription medication to her, which she claims to compound with herbs in her compounding lab then re-dispenses the adulterated

medication to her clients for consumption; she claims to have spiritual powers and connections to high-level spiritual masters and also acts as a medium who communicates with the dead. In reality, she is a con artist who has no known formal qualifications or licensure.

65. There is no evidence of any of VP's claimed degrees and accolades. Yet she charges between $500-$800 per hour for consultations.

66. As part of her efforts to manipulate Plaintiff and defraud him out of hundreds of thousands of dollars, VP told Plaintiff that she is descended from a 725-year long lineage of spiritual healers in India. Despite a relatively youthful appearance, she told Plaintiff that she is in her mid-sixties and has two young children, approximately 3 and 6 years old, who were allegedly naturally born to her when she was overseas. As a part of her fraudulent scheme to convince Plaintiff she had magical abilities, VP also told him that these children were the result of immaculate conception. Plaintiff believed VP's statements at the time, which influenced and caused him to pay for VP large sums of money to treat his daughters.

67. VP also told Plaintiff that she rescued and adopted 18 children, though most have never been seen by Plaintiff or any Members. On information and belief, VP makes these farfetched claims in order to increase her legitimacy to Plaintiff and others that she has magical powers that can preserve youth and fertility. Plaintiff believed these fraudulent claims at the time and it increased her legitimacy in Plaintiff's mind at the time as a healer, which in turn allowed VP and AUM to defraud him out of hundreds of thousands of dollars for their fraudulent services.

68. When clients go to VP or one of her AUM Members with a problem they are facing, AUM will introduce the clients to its "spiritual masters," Spookie Senior, Spookie Junior, and Techie (the "Spookies").

69. The Spookies allegedly are located in India and have the ability to predict the future, and will relay their visions to AUM Members upon a paid consultation in which the proceeds go to VP and AUM. Because the Spookies speak in an Indian dialect

and require an interpreter, VP directs clients to her associate Richard Walters, who acts as the intermediary between clients and the Spookies. It is believed that no one has ever met Richard Walters. His location is unknown, though VP has stated Richard lives in Europe. Plaintiff is informed and believes that VP disguises her voice and pretends to be Richard on phone calls, and that Richard Walters, the medium and intermediary with the spiritual masters, does not exist.

70. During "readings" with "Richard" and the Spookies, clients explain the problem they are facing and Richard connects with one of the Spookies for their recommendation as to how to solve the problem.

71. These "readings" cost varying amounts, depending on the level of Spookie who is needed and the level of divination required, paid to AUM or VP directly. For example, if VP determines that the client has financial constraints or limitations, she will offer a reading from a "Spookie-in-training" for a lower fee. Clients are asked to bring one or two witnesses assigned by VP to these readings and take notes.

72. The Spookies, after allegedly analyzing the client's problem as brought to them by Richard, invariably recommend "poojas," or prayers, which are meant to resolve the issue. These prayers, depending upon the complexity of the problem, cost between a few thousand dollars to over $25,000, also paid to AUM Ayurveda or VP directly. The actual cost of a pooja or prayer in India varies between $100 and $250 depending upon complexity.

73. Importantly, clients never connect with the Spookies directly and are only able to communicate with Richard via text message to a U.S. phone number. Once Richard speaks with one of the Spookies, Richard calls the client from a blocked phone number to relay the Spookies' message.

74. VP and Richard use these readings to establish the divinity of the Spookies, using details that clients have shared with VP or her AUM Members to convince the clients that the Spookies have real insight into their lives.

75. AUM also uses the Spookies to control its Members and prevent them



Glaser Weil

from sharing information with the outside world. If a Member shares information that AUM or VP does not want to be public, the client will receive a message from Richard or another associate accusing them of "oversharing," which upsets the Spookies, in order to scare and threaten people into submission.

76. VP projected herself to Plaintiff and other clients as a divine being who is able to correctly predict what the Spookies will say in a reading. Plaintiff did believe in VP and AUM and their advertised abilities at the time.

77. Once AUM has established trust with a client who becomes a new Member, VP and her associates turn to their cult's playbook of manipulating the Member with false accusations and lies about their condition, their history, or their family members in order to further isolate the Member and necessitate additional treatment and payments. VP ensures that Members do not share their conversations with the Spookies with outsiders, even spouses, siblings, and parents. Isolating clients from their support groups is a key step in the cult's playbook.

78. Once indoctrinated, VP and cult Members, following VP's lead and supervision, exert control over other cult Members by telling them to wear specific clothes on particular days so that they all match and can be identified as a Member. Additionally, VP will tell Members to wear particular colors to supposedly enhance their moods, ward off evil, and act as a complement to her jewelry.

79. VP and AUM insist that Members purchase and wear jewelry made by VP through AUM Sacred Art that supposedly prevent negative energy, and they are only permitted to read books approved by VP.

80. On information and belief, VP instructs Members to bring in their prescription medications to allow her to compound the pills with herbs, which she does and then returns to Members to consume after they have been compounded. Although VP claims to have a permitted compounding lab, on information and belief, she does not and this activity is illegal, misleading, and highly dangerous.

81. VP's and AUM's playbook is well established and documented, as several

former clients have warned online of their experiences with AUM and VP, stating that VP is a con artist without real qualifications and that she has scammed many people out of significant sums of money:

**A T.**
Colonia, NJ
0 friends
2 reviews

4/3/2025
Money looting business. Very very expensive.Rude, back biting! and your health information is not safe

**Neha P.**
Edison, NJ
0 friends
7 reviews

4/3/2025
very expensive with no reason. looting money. Her medicines that she says she makes or uses are absolutely of no use.

**Yikes M.**
Columbia Falls, MT
0 4 0

Jun 9, 2017

Unethical practice in all regards! I do not recommend AUM Ayurveda! Poor treatment of employees on staff. Pricing over expensive not consistent. Never gives receipt. Makes me wonder if Vaidya Priyanka has some trouble with the law or malpractice cases. I have given more money here and received little results. I have been misdiagnosed here and manipulated! Too much drama from someone who is a disgrace to the entire alternative, Ayurvedic health community. My personal experience and my friends I sent to her found this woman to be a pathological liar. Annoying pushy about returning for more appointments. My patient confidentiality was violated people i did not know shared intimate details with me that I shared in my private consultations. Why would An Ayurvedic doctor betray customer loyalty?

We need better practitioners with integrity and morals. This is a Shame please don't waste your time or money here.

**Vaidya E.**
Sunnyvale, CA
0 1 0

Jul 1, 2015

Most people don't know Priyanka V. like I do, so its only natural to wonder what testimony I might offer after being her patient for the last 8 years. My testimony amounts to a waring: DONT BELIEVE A WORD THE LADY SAYS.

Dont misunderstand me. Many people and many institutions lie and I get that. But Priyanka does it with such audacity, and such frequency, that she stands out.

When Priyanka meets a patient, she speaks so clearly and forcefully that you assume genuine conviction is behind it. Be careful, though. Its a kind of spell. She is a remarkable talent with a silver tongue. But if you look closely, you can see that it is forked like a serpent's tongue.

Helpful 8 Thanks 1 Love this 1 Oh no 0

Glaser Weil

82. Upon information and belief, VP has successfully been able to remove several one-star negative reviews from AUM's Yelp page:




83. On information and belief, VP owns several properties and expensive vehicles and has multiple nannies for her young children, which adds credibility to her façade and led Plaintiff to believe that she is a successful healer and businesswoman when in reality she has garnered significant wealth by taking advantage of vulnerable people through her fraudulent scheme and used the money she has extracted from desperate people to fuel her lavish lifestyle.

84. There is even a blog page dedicated to the cult tactics of AUM entitled "Truth About Aum Ayurveda" in which many former unwitting Members detail the fraudulent scheme that destroyed their families:

Glaser Weil

**CommonSense** May 3, 2012 at 4:12 PM

Vydyaji is an opportunist. Profiting from helpless cancer patients. She is not even a true ayurvedic doctor. Stay away from her if you have basic common sense.

Reply

**hurtbyaum** November 12, 2013 at 10:32 PM

I was naive, thinking that Vaidya was there to help my family. We gave her tons and tons of money without giving it an extra thought...trusting her. Now, I am no fool. I have had it with her lies, manipulations, and most of all her successful attempt to tear up my family.

One thing is for sure, she is clever and has covered her ass. Stay away from her.

Reply

**Beware** August 20, 2014 at 11:48 AM

Vaidyaji has all the scary features of someone with a narcissistic personality disorder. Beware. She will cause harm if she feels threatened. She chooses people who are naive, vulnerable and desperate and brainwashes them to worship her. Yes, she genuinely believes she IS a Goddess and expects to be worshipped. No, mere admiration is not enough.

I cannot believe that a professional can practice without divulging their family name. That means you cannot check her credentials and cannot complain about her to any authority.

Of course, her knowledge of Ayurveda is a separate matter. My comments are purely about her personality and her unjust manipulative behaviour with vulnerable people and people experiencing a low point in their lives.

Instead of using this blog to share experiences (no matter how reassuring), how about using this blog to provide ideas on how people can help others from falling into this Vaidyaji Priyanka trap. Is there any Ayurvedic regulatory board in the USA that can be approached to file a complaint?

Reply

Unknown July 18, 2014 at 2:25 PM

Thanks for creating this blog. I don't know where to even start. Like most people in this site, Priyanka has destroyed my family. Dealing with her has been like dealing with the devil.

From my experience, Priyanka tends to feed on people with low self-esteem and a weak mind. She tends to feed on people who have never been taught to feel good about them-selves, seek constant approval from those around them. I call it the "gold star" system, like they feel they deserve a gold star for everything they do. She finds these people and feeds them exactly what they want to hear and takes advantage of their money and uses them to serve her life and business. One of which is an employee of hers. This employee was apparently poisoned by the mom and was in the hospital. Priyanka first met the employee in the hospital. The employee's dad apparently contacted Priyanka for help. Personally, I haven't heard of a hospital that released a patient that was suspected of being poisoned (I work at a hospital, so I am very familiar with the protocols). Priyanka would publicize this information to everyone (including strangers) in front of the employee. Priyanka uses this tactic to get pity from everyone for the employee. Priyanka does this repeatedly to all her employees to reinforce and increate the hatred the employees have toward their parents and control them and give them false hope. Once the employees turn 18, even though they are not in a well state of mind, she uses the age as a power (parental control/consent is no longer needed at 18) to separate them from their parents. Priyanka manipulates and controls their day-to-day life to her benefit. The strange part of this story is that the employee (the one that was poisoned) still keeps regular/close contact with the parents, which seems really strange. This employee has also been a key role in breaking up my family.

In my experience I haven't seen this many bad reviews of a therapist, doctor or whatever she calls herself these days. There are many other ethical ways to get help from others. In my humble opinion, I would put her up in a pedestal with other cult leaders in history such as David Koresh, Marshall Applewhite, Jim Jones and Shoko Asahara. I am sad put her in any pedestal but the truth has to be told. She runs a very unethical practice and only has own self-interest.

Reply

## PLAINTIFF'S INVOLVEMENT WITH AUM

85. In or around early 2022, Plaintiff's family had the misfortune of being introduced to AUM through another family member.

86. SIL introduced S.S. to VP in early 2022. SIL's late husband had recently

Glaser Weil

been under VP's care, receiving holistic treatment for his cancer symptoms until he passed away in February 2021.

87. VP and her associates told SIL that the Spookies had divined that her husband's cancer was caused because he and his brothers destroyed a divine plant in a previous life.

88. VP and her associates bombarded Plaintiff and his wife with scare tactics for years, falsely insisting that their daughters were filled with homicidal urges, including that the elder sister posed a real and immediate threat to kill the younger sister, and that the elder sister had sexual perversions that needed to be removed. The only way, according to VP, that the daughter could be saved and healed from her homosexuality and sexual perversions was to have her live with other AUM Members in Santa Clara County, California, under the close and watchful eye of VP, who would inevitably come to control every aspect of her life.

89. After the death of the girls' uncle, VP provided "nutritious" meals and offered grief counseling to Plaintiff and his family. She offered her "healing" services to S.S. to help manage her arthritis pain.

90. In order to isolate SIL after her husband's passing, VP and her associates claimed that SIL's father-in-law had molested several young children, including his daughter. These false accusations were intended to separate SIL from her in-laws after her husband died, further isolating her and allowing her to become fully indoctrinated and immersed into the cult.

91. Ostensibly under guidance from the Spookies, VP convinced SIL to install a fence around her house to prevent her deceased husband's friends from visiting. VP convinced SIL that her mother-in-law had hired a black magic practitioner in Singapore to harm her and her children.

92. VP convinced SIL to pay a significant amount of money for treatments to alleviate her husband's suffering before he passed away. After her husband's death, VP further gained SIL's trust by offering grief counseling to her children.

93. On information and belief, VP indoctrinated BIL into the cult by falsely claiming that his wife had cheated on him with multiple people at her work and that she had received an abortion as a teen which prevented her from having children with BIL. VP influenced and manipulated BIL with claims that his wife was using "black magic techniques" to attempt to kill BIL. The black magic practitioner was supposedly living in Singapore and acquainted with BIL's sister-in-law. Despite the lack of evidence for any of these claims, but due in part because of them, BIL filed for divorce.

94. After S.S. and SIL's mother died in September 2022, VP took advantage of their grief by offering counseling and treating their father using naturalistic medicine. As a result of VP's care, their father, who was blind, was purportedly able to reduce his medications. This further solidified VP's legitimacy as a healer to SIL, BIL, S.S., and Plaintiff.

95. Once Defendants recruited and indoctrinated SIL and BIL as Members, they used SIL and BIL as agents to recruit S.S., Plaintiff and their family into the cult as part of their fraudulent scheme.

96. SIL and BIL, as agents of VP and AUM, were able to indoctrinate S.S. as a Member rather quickly. Then, Defendants began to use S.S. as a tool to brainwash and indoctrinate Plaintiff and his daughters into the cult. Although Plaintiff was initially more skeptical than S.S., he inherently trusted VP and AUM due to what he believed to be positive experiences by his family members, and had no reason to doubt that VP and AUM were able to provide the healing services they advertised.

97. S.S. was intrigued by the healthy food options VP sold and by her sister's seemingly positive experience with VP. As a result, she began seeking care from VP for her rheumatoid arthritis as well as preventative care for her two daughters.

98. When S.S. introduced her daughters K.D. and M.D. to VP later in 2022, VP offered to train K.D., an aspiring singer, with online voice lessons. K.D. did improve significantly following these lessons as a result of her increased practice, though VP took credit for this success in order to convince S.S. of her abilities.

99. VP earned the trust of Plaintiff through her treatment of S.S.'s arthritis and K.D.'s singing lessons, as well as by using S.S., a now fully indoctrinated Member, as a tool to help defraud Plaintiff. After that, following her typical playbook, VP began fabricating harmful lies and false diagnoses regarding the children in an effort to influence Plaintiff to relinquish control of his daughters and continue paying substantial sums to her for their treatment, which Plaintiff ultimately believed and relied upon, to his detriment.

100. Plaintiff and S.S.'s elder daughter K.D. had begun to identify as queer and lesbian. This troubled S.S. She expressed hope that it was a phase that would pass.

101. With this knowledge, in or around December 2022, VP informed Plaintiff that K.D. had deviant sexual tendencies allegedly caused by her reading manga comics. Plaintiff, due to his trust in VP fostered by his wife, believed this statement.

102. VP also told Plaintiff that reading manga comics caused K.D. to be unable to separate reality from fantasy, and instructed Plaintiff to get rid of all manga from their home.

103. VP told Plaintiff that she would be able to cure K.D.'s "ailments" through treatment, which essentially functioned as conversion therapy. Plaintiff and S.S. had argued over K.D.'s sexual orientation and gender identity. Plaintiff believes that neither is a choice. S.S. expressed her belief that they are choices and that K.D.'s "choices" were deviant and needed to be cured. In the spirit of keeping peace at home, and due to the trust that Plaintiff had in VP and her legitimacy as a healer and spiritual leader due to his family members' previous experiences and their manipulation of him as Members and agents of VP and AUM, Plaintiff relied on and believed in V.P.'s abilities and thus agreed to pay VP for their daughter's treatment with the understanding that it was not going to be a form of conversion therapy but rather therapy to help his daughter better understand and come to terms with her sexual orientation and gender identity. Plaintiff believed and reasonably relied on this representation by VP, which later proved to be false.


Glaser Weil
3156070

104. As a result, VP convinced Plaintiff to take K.D. and M.D. to San Jose, California, where AUM is located, during their spring break from school in 2023. At that point, VP convinced Plaintiff that he needed to send both of the children to a summer camp run by VP and AUM.

105. As part of this camp, the children were required to leave their cell phones behind and calls would be monitored by VP. As a result, Plaintiff was unable to contact his daughters for several weeks despite the fact the younger girl was only 12 years old at the time.

106. When S.S. visited her younger daughter in California during the summer of 2023, VP informed her that her daughters would require additional treatment, which meant a longer time isolated from their parents and, of course, additional money paid by Plaintiff.

107. After the summer, Plaintiff began to see positive improvements in his younger daughter such as improved reading skills. VP also assisted M.D. with getting contact lenses to improve her eyesight which Plaintiff perceived as enhancing her physical abilities such as dancing. This further legitimized VP as a healer in the eyes of Plaintiff, increasing his trust in her abilities. Plaintiff later discovered that a friend of VP took M.D. to get the contact lenses, but VP took credit for the friend's work.

108. M.D. started to become very guarded in her communications with her father and began constantly texting VP. S.S., acting as an agent of VP and AUM, refused to allow Plaintiff to read the texts and prevented him from knowing what his daughter was communicating about with VP. S.S., as a fully indoctrinated Member, also began seeking VP's advice on all issues, from what she should wear to who she should hang out with.

109. After the camp ended, K.D. stayed with SIL in California to continue receiving treatment from VP.

110. VP began to be involved in the young girls' medical care apart from the therapy and reading instruction. For example, VP instructed Plaintiff to not allow his

children to receive flu and COVID-19 vaccines.

111. Because Plaintiff trusted and believed in her healing powers at that time, VP effectively became the children's primary care physician, as they were not permitted to see any medical professionals and, on information and belief, K.D. has not seen a primary care physician since 2023, despite the fact that both children remain as dependents on their father's medical insurance plan.

112. In or around late July or early August of 2023, VP, in California, called S.S., in Texas, to tell Plaintiff that she had received a warning from the Spookies that K.D. had murderous thoughts and tendencies and had searched online how to strangle her little sister. Plaintiff was surprised by this claim as K.D. had never been violent before. But K.D. and M.D. apparently continued to live together at VP's behest despite the allegation that K.D. wanted to kill her sister.

113. VP, in California, also told Plaintiff, in Texas, that one of the Spookies warned her that K.D. was planning to take her younger sister to Mexico in an unmarked white van to be sold as a sex slave. VP said that the Spookies claimed that K.D.'s young teenage friend from high school in Texas was the ring-leader of an international child trafficking group, and would receive $2,500 for every child they brought to Mexico.

114. Plaintiff believed VP's false accusations and was horrified, which allowed VP to convince him to officially move K.D. to California in late summer 2023 and enroll her in a private school in Santa Clara County to avoid these dire situations that the Spookies, through VP, warned would come to pass.

115. Plaintiff initially resisted the effort to allow K.D. to go to California, but VP and AUM, and S.S. as a tool of their fraudulent enterprise, acted in concert to manipulate Plaintiff into believing these lies, which he ultimately did. Because Plaintiff trusted VP's representation that his daughter was in danger, he relented and paid for her lodging and schooling in California.

116. Plaintiff now believes that VP and her Members, including but not limited to SIL, BIL, Richard Walters, and Gautam Kumaran were preparing S.S. to engage in



Glaser Weil

arguments with Plaintiff regarding his daughters' care in order to control and manipulate him into submission. For example, while in California, V.P. and her Members appear to have scripted statements and arguments for S.S. to make to her husband in order to overcome his objections to allowing his daughter to remain in California under VP's care and custody.

117. VP assured Plaintiff that K.D. would only receive treatment in California for a few months and he would be able to see her on holidays. Instead, VP and AUM prevented Plaintiff from having any further contact with K.D. since, causing him to miss all holidays with her and even her high school graduation. In fact, Plaintiff has been prevented from seeing K.D. at all since July 2023. Of course, had Plaintiff known then what he knows now, he never would have permitted his children ever to have any contact with VP and AUM, let alone move to California.

118. Upon K.D.'s move to California, VP took control of her cell phone and insisted she receive a new phone number and email address so that she no longer had contact with her father or any of her friends in Texas.

119. Whenever Plaintiff was scheduled to visit his daughter, VP would contact Plaintiff and say that K.D. had some kind of psychiatric break or meltdown – which Plaintiff believed but which was a lie – and that she could not speak to or see him after all.

120. Although many of Plaintiff's friends and spiritual advisors questioned his decision to send K.D. to California, VP and S.S., acting as an agent and Member of AUM, repeatedly instructed him not to share any information about his daughter to outsiders, further isolating him and his family from their community and preventing them from hearing important outside perspectives.

121. Once K.D. moved to California, VP continued to manipulate Plaintiff into relinquishing control over his daughter. For example, VP convinced him to fire M.D.'s singing teacher because VP claimed the teacher used "black magic" to manipulate children. Plaintiff relied on this representation and complied.

122. VP also instructed Plaintiff to avoid using insurance to pay for any of K.D.'s medical care in order to prevent an established record of mental health treatment, which VP claimed would prevent her from being admitted to a good college. Plaintiff believed and relied upon these statements, which resulted in an increased cost of K.D.'s care by at least 35%, which Plaintiff was required to and did pay to VP and AUM.

123. VP also began to falsely claim to Plaintiff that K.D. was making sexual advances on the therapists who were treating her. Plaintiff was initially incredulous because this was very out of character for his daughter, but ultimately he trusted and believed VP at that time due to the extent of her manipulation and fraud. Plaintiff relied upon VP's representations given that his daughter was in her care and custody and VP prevented him from seeing his daughter to verify her claims.

124. When Plaintiff pushed VP to provide the names of the therapists and counselors treating his daughter in order to use his insurance for payment, VP refused under the guise of privacy concerns, which is nonsensical given that K.D. was a minor and Plaintiff is her father, and is the one paying for her medical and mental health treatment. Plaintiff was coerced and misled by VP to pay over $100,000 for ongoing psychological treatment for K.D.

125. VP and AUM have controlled every aspect of K.D.'s daily life since she has been under their control in 2023, including deciding which private high school she would enroll in and to which colleges she could apply.

126. As a result of the cult's fraudulent scheme, Plaintiff was forced to spend over $55,000 in tuition costs to send K.D. to a private high school in California, which he would not have incurred if she had stayed in Texas and attended the very highly-rated public school nearby as planned. K.D. was in fact enrolled at a premier school in Texas and had a 4.75/5 GPA when she was forced to move to California. However, due to VP and AUM's manipulation and lies, Plaintiff believed that K.D. was in danger if she did not continue treatment in California and attend this school, which forced him

to make these tuition payments.

127. AUM also arranged for K.D. to stay in a house with an unknown male, Gautam Kumaran, who is unrelated to Plaintiff and an associate of VP and is believed to be an AUM Member. This arrangement, which VP represented to Plaintiff as necessary for his daughter's treatment and safety, and which representation Plaintiff believed and relied upon, required Plaintiff to pay $1,000 per month in rent, which was later increased to $1,400 per month. This has totaled approximately $48,000 to date, another exorbitant cost that Plaintiff would not have paid had he been able to keep K.D. at home with him in Texas, rather than pay for her to be in California due to VP's false representations.

128. Plaintiff made regular payments through checks, wire transfers, and/or electronic payments to VP, AUM and Gautam for food and other necessities for K.D that V.P. stated was necessary, and which Plaintiff believed and relied upon. Without VP's false representations that Plaintiff's daughters needed her medical care, which Plaintiff believed at the time they were made, Plaintiff would never have transmitted hundreds of thousands of dollars to VP and AUM and its Members.

129. VP used S.S. to demand more and more money from Plaintiff for various treatments and necessities for S.S. and their daughters, though Plaintiff often was not privy to details and was told to trust VP and the Spookies' guidance, which he did.

130. At all relevant times, Plaintiff and S.S. had joint bank accounts. A substantial amount of money in these accounts came from Plaintiff because he earned more than S.S. His paychecks and earnings and bonuses were deposited into his joint accounts with S.S., while S.S. had her paychecks directly deposited into only one of the joint accounts. Plaintiff monitored the balances of both accounts carefully and would pay, or approve payment of, expenses out of whichever account had a larger balance.

131. Whenever VP demanded money for Plaintiff's daughters' treatment, she would request it at times from Plaintiff directly, but primarily through S.S. S.S. would



Glaser Weil

relay the request from VP to Plaintiff and Plaintiff would deposit money into one of the joint accounts so that S.S. could write a check from that account to VP or AUM from both of them. Plaintiff had to approve these payments and deposit the money into the account from which the payments were made to VP and AUM.

132. All payments made to VP and AUM were paid from one of the couples' joint bank accounts, which monies belonged at all times to Plaintiff and S.S. and each of them, with a substantial amount of the funds originating from Plaintiff's earnings.

133. Plaintiff was aware of and consented to all of the payments made to VP and AUM from him and/or S.S., whether the check was signed by Plaintiff or S.S. or the monies wired or electronically transmitted by Plaintiff or S.S. These payments were made as a result of VP and AUM's manipulation of Plaintiff, taking advantage of the fact that Plaintiff relied upon and believed their false representations and scare tactics.

134. Beginning around late 2022, S.S. began acting under the influence and control of VP as AUM's agent. VP and AUM used S.S. to further deceive Plaintiff into continuing payments for his daughters' treatment. Even if Plaintiff had initial skepticism about a certain aspect of the treatment or spiritual readings, he trusted VP and his wife (who was an agent of VP and AUM) and believed that they had the best interests of his daughters in mind and therefore relied on their representations.

135. Once K.D. was in California under VP's care, VP "diagnosed" K.D. with manic depression, bipolar disorder and schizophrenia. The Spookies told S.S. and Plaintiff that VP would be able to cure these conditions using herbal treatments within four years, by 2027, if K.D. remained sequestered in California with VP and poojas were regularly conducted. Plaintiff believed these statements and continued to make payments to VP and AUM for his daughter's treatment.

136. In November 2023, VP informed Plaintiff that K.D. was associating with transgender students at school, which was forbidden behavior according to VP and the Spookies. As punishment, VP prevented K.D. from celebrating S.S.'s or her own birthday with her family in Texas over Thanksgiving break.

137. By December 2023, VP's scare tactics to convince Plaintiff that K.D. needed additional treatment had escalated. VP now told Plaintiff that K.D. had attempted to stab Gautam's mother, who lived in the same house as K.D. Although VP claimed this was caught on one of the alleged twenty or more cameras in the house that surveil K.D. constantly, she has refused to show any such corroborative footage to Plaintiff. Nor did she provide evidence that a police report had been made. Without proof that this allegation was false, Plaintiff believed VP who he had trusted with caring for his daughter.

138. VP also falsely told Plaintiff that K.D. attempted to grope Gautam's mother, a woman in her eighties, alleging this was further proof of K.D.'s sexual deviance. No evidence was ever provided about this event either.

139. Following these accusations, VP had Richard tell Plaintiff that in order to resolve K.D.'s murderous tendencies he would need to pay for poojas. Plaintiff believed this lie, and in December 2023, he authorized S.S. to transmit a payment of $16,631.83 from the couples' joint bank account, with Plaintiff's consent, to AUM for a pooja. By January 2024, VP proclaimed the pooja had worked and K.D. was better and no longer had murderous or sexually deviant thoughts.

140. By summer 2024, Plaintiff began to allow M.D. to regularly visit VP and receive treatment, to the point that she began to spend all holiday breaks in California. Plaintiff flew to California in July 2024 to see his daughter for her birthday. But VP claimed K.D. was too busy studying to see her father whom she had not seen in over a year and she refused to allow him to see his daughter.

141. VP also falsely claimed to Plaintiff and S.S. that she cured S.S. of cancer three separate times during 2024 using her "healing" massages. S.S. believed this claim despite no medical evidence of her having cancer in the first place.

142. Furthermore, VP directed her associates to help her spread false accusations in order to further indoctrinate their Members. For example, BIL told Plaintiff that he saw Marc, an AUM employee who has never been seen by outsiders,

with cuts on his face after K.D. allegedly attacked him, but again no video evidence or police report documenting this was ever provided to Plaintiff despite his requests.

143. By March 2025, VP began alleging to Plaintiff that K.D. was increasingly interested in drugs, requiring further treatment. Again, Plaintiff found this surprising given that K.D. had never shown such interest before, but without evidence to contradict this allegation, and not having seen his daughter in close to two years, he believed these statements and began to fear for his daughter's life even more.

144. VP also falsely accused K.D. of attempting to sell hundreds of dollars of jewelry made by VP and AUM Sacred Art in order to buy drugs.

145. In or around April 2025, VP frantically called S.S. and demanded that she come to California as K.D. had apparently overdosed on some kind of drug cocktail. Though VP claimed a drug test was administered, Plaintiff was forbidden from reviewing the results. VP speculated that K.D. overdosed on bath salts and reassured Plaintiff that she was "detoxing" K.D. No information was provided to Plaintiff about the overdose or the treatment and Plaintiff was prevented from seeing his daughter. Plaintiff believed VP's statements that his daughter had overdosed. This, of course, caused Plaintiff to fear for his daughter's safety even more, and reinforced his belief that he needed to continue paying VP and AUM for his daughter's treatment.

146. In April 2025, in response to the alleged overdose, at VP's direction, S.S. prevailed upon Plaintiff to allow her to write several checks from their joint account to VP and AUM, including $9,943.81 for a pooja, $33,180.00 for a trip to India for spiritual guidance, $19,238.00 for K.D.'s treatment, and $15,305.76 for S.S. and M.D.'s treatment, totaling over $77,000. Plaintiff agreed to these payments because he believed VP and AUM's lies at the time.

147. In April and May 2025, VP instructed S.S. to go to India to meet with spiritual advisors for several weeks in order to accelerate her and her daughters' treatment. Once in India, VP ordered S.S. to purchase several suitcases full of items, claiming that the items had been divinely blessed. S.S., as an agent and Member of



Glaser Weil
3156070

AUM, demanded that Plaintiff fund these trips from their joint bank account in order for their daughter to get better. These trips cost $25,000 or more and Plaintiff paid and/or approved payment of these amounts to AUM. Plaintiff agreed to fund these trips because he relied on VP and AUM's false representations that his daughter needed treatment and that they would assist in furtherance of her treatment.

148. In or around May 2025, both VP and Richard, who were in California, began making false accusations regarding Plaintiff's father who lived with him in Texas, alleging that he molested eight children, including K.D. and M.D. S.S. and Plaintiff were directed to a reading with Richard after a few days, when the number of victims rapidly increased to 38 without detail.

149. Also in or around May 2025, VP told Plaintiff that one of K.D.'s therapists confirmed she was a victim of abuse by her grandfather, though again VP would not tell Plaintiff the name of the therapist or any other details. Despite the fact that therapists are mandatory reporters of child abuse, there is no evidence that any report was made to the authorities by VP or the therapists she engaged who related these accusations to her at that time. Nevertheless, Plaintiff relied on these representations to continue funding his daughter's care.

150. Months later, at the end of July 2025, K.D. allegedly saw a therapy intern in Pismo Beach, CA, remotely and claimed for the first time, despite years of therapy previously, that she had been abused by her father in addition to her grandfather. The therapy intern then made a long-belated CPS report reflecting the false accusations of abuse. This report was never given any serious credence by CPS, likely because it is an obviously manufactured report.

151. Additionally, VP told S.S. and Plaintiff that K.D. allegedly confirmed this abuse during a lie detector test witnessed by BIL. Notwithstanding the gross invasion of privacy and inappropriateness of a non-medically licensed professional subjecting a minor to a lie detector test witnessed by her uncle to discuss false allegations of child abuse and molestation by her grandfather, and without the presence or authorization of



Glaser Weil
3156070

her father, Defendants refused to provide any evidence or results from this event to Plaintiff. VP confronted Plaintiff with the supposed results in an effort to manipulate him. But when Plaintiff requested the lie detector test results and to speak with his daughter, VP refused. Instead, she threatened to inform his employer that he was harboring a pedophile by allowing his father to live with him. VP's main associate Richard told Plaintiff that by letting his pedophile father live with him, he was likely to lose his job. Richard also added that the sale value of Plaintiff's home would decrease for harboring a pedophile in it. He told Plaintiff, "you have the best people in the world working for you," and asked him to continue listening to VP and the Spookies. Plaintiff continued to fund his daughters' care, believing and relying on these statements.

152. Richard also falsely alleged to Plaintiff and S.S. that Plaintiff's father sexually assaulted his cousins, one residing in Minnesota and the other residing in India, who have both adamantly denied this ever occurred.

153. The false allegations made by Defendants against Plaintiff and his father have completely eroded the relationship Plaintiff had with his young daughters who have now been turned completely against him. These false memories were concocted and implanted in young impressionable minds by a manipulative cult.

154. Richard and VP continued to manipulate Plaintiff into relinquishing control over M.D. based on their false accusations and instructions to not to overshare with family or Plaintiff. They also encouraged S.S., as an agent and Member of AUM, to push back against Plaintiff's resistance to AUM's control over his daughters and encouraged her to continue to manipulate him to make large payments to AUM under the guise of necessary treatment for his daughters, which at this point, Plaintiff still believed and trusted, over his growing doubts.

155. Texts between Richard and S.S. from May and June of 2025 indicate that he and VP were continuing to exercise control over S.S., encouraging her to keep their plan to move M.D. permanently to California private by deleting these messages, which on information and belief, exhibit consciousness of guilt and attempts to cover up



Glaser Weil

wrongdoing. In these texts, Richard repeatedly refers to S.S.'s dead father, who had passed away over six months prior to these texts, and purports to convey messages to S.S. from her dead father that were passed on through him from the Spookies. This is another obvious attempt to manipulate and exercise control over S.S., and ultimately Plaintiff, by VP and her cohorts.

Mon, May 19 at 5:54 PM

Read yr whatsapp

Yr dad is living with regard to what u have been doing

Mon, May 19 at 6:55 PM

---

Livid *

Has the confusion resolved ?

Yes, he is calm right now

What is the resolution

We are not talking about anything right now.

The spookies don't like to be overstepped by the spiritual guidance they are giving you

Techie has said that if you don't want their attention and advice,they are willing to drop their association

Will be careful going forward. Was overcome by anger.

Combined by the need to have more funds at my disposal.

Tue, May 20 at 9:48 AM

What r u doing

Techie is going nuts

Stop making frantic calls

He can clearly see everything

Plaintiff wants to hold MD back from moving to California beacuse bank balances are drying up

I asked BIL if my portion of my father's funds can be used towards her tuition and living.

Tue, May 20 at 11:09 AM

Ofcourse it can be

But pls ask Techie or yr dad first



Glaser Weil

So he can guide u

Now do u relaise what yr oversharing has done

Yes, I do

Will ask for guidance before transferring funds.

He cannot screw up MD's future

I am worried about that as well.

Tue, May 20 at 5:35 PM

What is the plan now

Is M relocating as planned ?

Tue, May 20 at 6:48 PM

I have not brought it up with D yet. Will bring it up with him in a bit.

Will mention to him that funds will come from my father's account.

It is a struggle. He says he wants to see real progress with KD before committing MD to California and a spend rate that is unsustainable.

He wants to talk once I return from India.

MD will be going to California for Memorial Day weekend and again on June 6th when the school year ends.

Tue, May 20 at 11:33 PM

So she will be going to private school in Santa Clara County

Yes ?

And is the old man leaving ?

Wednesday 4:17 AM

The old man is leaving for sure.

MD will spend the summer in California. He has not started looking for other schools. So my sense is he will agree to valley, but I don't have a yes from him.

I don't have access to Splitwise. He needs to see the spend on things other than just pujas.

He is going crazy on the spend.

He thinks the spend is going to stay this way.

Wednesday 5:26 AM

He also doesn't like that he has been kept away from all decision making.

Wednesday 7:38 AM

Explain to him that the spend will not stay this way since she is recovering

Say u know that for sure

Also say jt is unfair to M[redacted] and it can be sorted out

I have said all that. He also says the relationships are too transactional. One pays to get what they want instead of Bhakti. It is going to need Vaidyaji or one of the spookies to explain to him. It is very hard for me to break in when he is in that frame.

It could also be that he has sensed that I am going to leave him. So by keeping M[redacted] here he can keep the marriage.

That is true

All this could have been averted if you had not been so out there

With emotions

Had a long conversation with him. He is questioning everything including the validity of the accusations about his father, ashtami and navami given as good days to pay the deposit at the new place for his father.

He wants to ask his cousin she was molested by the man.

Ask him to ask those questions to the spookies

He can do what he wants b

With regard to his cousin

Just text him the following verbatim

Do you know that the way I saw our daughter K[redacted]that day, she was closer to her death, than her life, so have gratitude for people who know more than you

I don't want him to get upset with me because I am sharing too much with you and deny M[redacted] the opportunity.

Not seeing the older one is hurting him.

He called again. He says he is being stalled. His questions don't get answered and he is kept out of everything.

Glaser Weil




156. Plaintiff believed and relied on these false statements at the time, which were made by VP and Richard in California to Plaintiff in Texas, which caused Plaintiff to pay nearly $1,700 to VP for the Spookies to conduct prayers to rectify this issue.

157. VP and Richard instilled fear in Plaintiff by forcing S.S. and M.D. to make last minute changes to their flights home when they traveled from Texas to California, alleging that their lives were in danger if they stayed on that flight. Plaintiff, as he was accustomed to based on the repeated scare tactics of VP and AUM, believed and relied on these statements as well. This occurred on so many occasions that Plaintiff began ensuring that S.S. purchased only refundable tickets, which resulted in Plaintiff incurring at least an extra $300 per plane ticket, with hundreds more in last minute flight change fees and also required payments directly to AUM for helping them avoid disaster.

158. Since K.D. was sent to California, VP has completely cut Plaintiff out of her life and rendered him unable to make decisions regarding his daughter's education or other aspects of her life. VP and the Spookies have told Plaintiff that allowing him

to contact K.D. would harm her energy and ability to heal. Plaintiff believed these representations, which caused him severe emotional distress.

159. Every aspect of K.D.'s life is decided by VP and AUM, including what she eats, watches, wears, and who she hangs out with. VP hand-picked a list of universities to which K.D. was allowed to apply, none of which were located in Texas. VP coerced Plaintiff to enroll in college in Northern California, close to VP so that VP can continue to exercise her control over K.D. and keep her in the cult

160. M.D. was also taken to California in June 2025. VP forced her to turn off her phone so that her father would not be able to track her location. Plaintiff does not know her current whereabouts. AUM demanded that Plaintiff pay $1,500 per month for her housing costs, despite not knowing her location or with whom she is living. These costs have added up to more than $50,000 including other living expenses. Plaintiff has paid this money to VP and AUM based on the false representations made by Defendants discussed herein on which he relied.

161. Over the last several months, VP and AUM have turned S.S. against Plaintiff, claiming that he and his father are the reason she suffers from rheumatoid arthritis, and that Plaintiff's treatment of the children caused their mental health crises.

162. VP informed Plaintiff that if not for her causing "this separation" between him and his daughters, K.D. "would have been suicidal" or would "have been a sex slave." Plaintiff believed these statements. This further solidified his fear for his daughter's safety and reinforced to him that his only option was to continue to pay VP and AUM for his daughter's treatment.

163. On information and belief, Plaintiff believes that VP exercises control over his daughters and his wife through chemical submission, possibly through their food and compounded pills, based on observations that his wife has a glazed appearance and has become unusually quiet and withdrawn. Others have made similar observations about K.D. and M.D.

164. Plaintiff has no current knowledge of, and no longer consents, to VP



Glaser Weil

administering any medications, supplements, drugs or substances to his children.

165. The cult has destroyed Plaintiff's family, forcing him to file for divorce from his wife who is fully indoctrinated in the cult and who is attempting to force him to relinquish his parental rights to strangers.

**FIRST CLAIM FOR RELIEF**

**(RICO – 18 U.S.C. §§ 1341, 1343, 1962, 1964, *et seq.*)**

**(Against All Defendants)**

166. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

167. Plaintiff is informed and believes, and on that basis alleges, that Defendants created a web of false accusations and diagnoses to manipulate and defraud Plaintiff out of over $722,000 during the period from late 2022 to present under the guise of his daughters' mental health treatment and health and wellness therapies.

168. Plaintiff is informed and believes, and on that basis alleges, that Defendants induced Plaintiff to make and approve these payments on the basis of Defendants' knowingly false representations regarding his daughters' mental health diagnoses, when in fact Defendants knew or should have known that Plaintiff's daughters were not suffering from the ailments claimed.

169. Despite Defendants' knowledge that Plaintiff's daughters were not suffering from these ailments, Defendants knowingly and willfully represented to Plaintiff that his daughters were suffering from these ailments and their lives were in danger with the intent of causing Plaintiff to rely on their representations to make exorbitant payments for their treatment totaling over $722,000.

170. To facilitate this scheme, VP utilized her various business entities and claimed training, abilities, certifications, and licensure to create legitimacy in order to cause Plaintiff to reasonably rely on Defendants' claims, which he did.

171. Plaintiff, from joint accounts with S.S. that consisted largely of his money, transmitted and authorized payments via electronic transfers or wires or checks sent



Glaser Weil
3156070

through the mail to VP and AUM totaling over $722,000 based on Defendants' false and fraudulent representations. These payments were to Plaintiff's detriment and crossed state lines in that they were initiated in Texas, where Plaintiff resides, and Plaintiff is informed and believes that the money went to California, where VP resides and AUM is based.

172. Whenever VP and AUM required additional payment for their fraudulent services, at times they demanded money directly from Plaintiff and at other times they used S.S., a Member and agent of VP and AUM, to manipulate Plaintiff to move money into a specific account from which the electronic transfer or wire or check would be made to VP and AUM.

173. Plaintiff is informed and believes, and on that basis alleges, that the moneys received by AUM were funneled to VP.

174. Plaintiff is informed and believes, and on that basis alleges, that none of the money AUM or VP received was used for its intended purpose of curing the daughters of their falsely claimed ailments, and were instead fraudulently taken from Plaintiff for the personal benefit of VP and her Members in running a cult.

175. Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Defendants VP, AUM, and DOES 1-50.

176. Section 1962(a) makes it:

> unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

177. Section 1962(c) makes it:

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

178. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions.

179. Defendants are associated with each other and with the Doe defendants, who will be identified in discovery, as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

180. Defendants have extorted hundreds of thousands of dollars from Plaintiff by fraudulently misrepresenting that his daughters were in danger and suffering from various mental health ailments which required Defendants' treatment. The RICO enterprise, which all Defendants, their Members including S.S. and others identified herein, and the Doe defendants who will be identified in discovery have engaged in, and the activities of which have and continue to affect interstate and foreign commerce, is comprised of an association in fact of persons, including each Defendant and other named and unnamed co-conspirators described herein and currently identified as Doe defendants. Defendants engaged in a mail and wire fraud scheme to recruit clients and indoctrinate them into the cult in order to manipulate Members into paying exorbitant sums for fraudulent treatments, which were transmitted electronically through the wires and through interstate mail.

181. The members of the RICO enterprise all share a common purpose: to enrich the cult and its leader at their clients' expense by fraudulently misrepresenting the holistic treatments provided by AUM and VP. As set forth herein, Defendants benefited financially from their scheme to defraud Plaintiff.

182. This RICO enterprise has existed for at least three years and continues to expand and operate as it recruits new members into the scheme. The RICO enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

183. The enterprise is characterized by Defendants' pattern of false



Glaser Weil

representations and omissions regarding its holistic treatment designed to manipulate Plaintiff and others into paying exorbitant sums for family members' treatment. The enterprise also involves assisting Members in making fraudulent police and CPS reports and sending defamatory letters regarding Plaintiff in the mail. It was known by Defendants that their misrepresentations were false and that Plaintiff's daughters were not in danger or suffering from extreme mental health issues.

184. Defendants profit from the enterprise, and Plaintiff suffered because the enterprise caused Plaintiff to pay hundreds of thousands of dollars for treatment, rent and other unnecessary expenses for his family members. Defendants used the proceeds from this scheme to advance the scheme by funding and operating their recruitment of additional members into the cult, obtaining payments via electronic means over interstate wires, thereby growing the enterprise and causing further injury to Plaintiff.

185. Defendants' scheme was reasonably calculated to deceive Plaintiff through the execution of their complex and illegal scheme to misrepresent—through affirmative misrepresentations and omissions—the severity of his daughter's mental health diagnoses and physical health, which required immediate treatment that cost Plaintiff a substantial amount of money. Plaintiff would not have paid for these treatments or other expenses but for the illegal racketeering scheme operated by Defendants.

186. Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiff, and each participated in the enterprise as follows:

187. VP directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to engaging in the following: (a) recruiting Members and clients by advertising AUM's fraudulent services on her website and social media; (b) directing Members to Richard and the Spookies for fraudulent readings; (c) demanding payment for fraudulent services and other expenses such as international trips, pookas, yagyas, jewelry made by AUM

Sacred Art, LLC, food made by AUM Cuisine, compounded drugs made by VP, clothes, rent and tuition, often via interstate wire transfers; (d) manipulating Members like Plaintiff into relinquishing their parental rights so she can exert control over the children in an effort to extort additional payment for treatment; and (e) devising, facilitating and orchestrating false accusations against Members who question the activities of the enterprise, including by means of assisting in the filing of false police and CPS reports, and sending defamatory letters about Members in the mail.

188. AUM directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to engaging in the following: (a) recruiting Members and clients by advertising its fraudulent services on its websites and social media; (b) directing Members to Richard and the Spookies for fraudulent readings; and (c) receiving payments for fraudulent services and other expenses such as rent and tuition, often via interstate wire transfers.

189. AUM's associates direct, control, and participate in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to engaging in the following: (a) recruiting Members into the AUM cult, allowing the scheme to grow larger and extort more people; (b) encouraging Members to relinquish parental rights in an effort to extort additional payment for treatment; (c) exerting control over K.D. and M.D.'s lives by overseeing their comings and goings such as supervising pick ups and drop offs to and from their school; (d) housing K.D. and M.D. in a different state than their father and collecting exorbitant rent payments; (e) providing "healing" massages to clients in an effort to recruit them into the cult and extort exorbitant payments for fraudulent services; and (f) filing false police and CPS reports and false restraining order applications about their father, and sending defamatory letters about Plaintiff in the mail.

190. During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B),



Glaser Weil
3156070

in violation of 18 U.S.C. § 1962(d), as described in this Complaint.

191. Beginning at an exact date unknown to Plaintiff, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

192. The acts set out in this Complaint and more to be uncovered in the course of discovery had the same pattern and purpose to defraud Plaintiff for the benefit of Defendants. Each act involved the same or similar methods of commission and participants and affected Plaintiff similarly.

193. Without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering, Defendants' business would not have succeeded.

194. The separate acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiff and others to become indoctrinated in the cult and pay substantial sums of money for fraudulent services.

195. Defendants' wrongful conduct has caused injury to Plaintiff, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiff and the general public.

196. Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

197. To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail fraud and wire fraud.

198. Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiff. Defendants' pattern of mail fraud and wire fraud was the proximate cause of the injuries suffered by Plaintiff.

199. Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff out of money, in reliance on the mail and wires. Defendants

committed these acts with the intent to defraud Plaintiff.

200. Defendants used the mail, email, internet, and text and internet messaging for the purpose of executing the fraudulent scheme herein.

201. Specifically, Defendants used the mail, email, internet, and text and internet messaging to advertise regarding their fraudulent services, as well as to solicit and obtain payments they extorted from Plaintiff and other clients. This includes Defendants retaining their wrongful control and custody over Plaintiff's daughters, such as enrolling them in private school in California despite their residence and parents being located in Texas.

202. On information and belief, the Defendants also used the mail, email, internet, and text and internet messaging to assist in the filing of false police and CPS reports, and sending defamatory letters about Plaintiff.

203. Defendants could not have furthered their fraud without the use of the mail, email, internet, and text and internet messaging. Therefore, Defendants committed multiple acts of mail and wire fraud in violation of 18 U.S.C. § 1341 in furtherance of the enterprise.

204. Defendants also voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff out of money, in reliance on interstate wires. Defendants committed these acts with the intent to defraud Plaintiff in violation of 18 U.S.C. § 1343.

205. Specifically, Defendants used interstate wires to disseminate advertisements of their fraudulent services, as well as solicit and obtain payments they extorted from Plaintiff and other clients. Defendants' racketeering scheme took place largely in California while Plaintiff was in Texas and he regularly sent payments from his bank accounts in Texas to Defendants' bank accounts in California.

206. Defendants also used telecommunication wires to interact with AUM affiliates located outside of the United States such as Richard, who on information and belief is located somewhere in Europe, and the Spookies, who allegedly reside in India.



Glaser Weil

207. Defendants could not have furthered their fraud without the ability to use the telecommunications wires to share information with other Defendants. Plaintiff has been proximately and actually harmed by Defendants' actions in the amount of over $722,000, plus all pre-judgment interest, as well as the loss of the ability to utilize this money for other investment purposes.

208. Additionally, Defendants, and each of them, have acted willfully, knowingly, and without conscious disregard to Plaintiff's rights as alleged herein that the actions constitute malice, oppression, and/or fraud to the extent that punitive damages are warranted to punish the Defendants, and each of them, for their outrageous behavior as described herein.

209. Plaintiff has suffered hundreds of thousands of dollars of damages as a result of Defendants' RICO violations in an amount to be proven at the time of trial and trebled under 18 U.S.C. § 1964(c). Plaintiff is also entitled to an award of his attorneys' fees under 18 U.S.C. § 1964(c), in an amount to be proven at trial.

210. Plaintiff further seeks an award of pre- and post-judgment interest on any and all damage awards made herein at the highest rate allowable under the law.

**SECOND CLAIM FOR RELIEF**

**(Fraud)**

**(Against All Defendants)**

211. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

212. On information and belief, during the period from late 2022 to present, Defendants knowingly and willfully defrauded Plaintiff by inducing him to pay and/or approve payments totaling over $722,000 for his daughters' mental and/or physical health and medical or other treatment by representing to him that his daughters' lives were in danger without such treatments and/or arrangements, as well as to "rectify" them of various other ailments and conditions.

213. Plaintiff believed and relied on Defendants' representations regarding the



Glaser Weil

diagnoses and treatment of K.D. and M.D. and that their businesses and services were legitimate. Plaintiff's reliance was reasonable and foreseeable, as VP and AUM held themselves out to be legitimate healers with strong qualifications and the best interests of his daughters in mind.

214. On information and belief, Defendants intended for Plaintiff to rely on their representations despite knowing they were false.

215. Plaintiff was injured by his reasonable and foreseeable reliance on Defendants' misrepresentations.

216. All payments to Defendants were made directly or indirectly by Plaintiff, with his knowledge, consent, and/or approval, from Plaintiff's and S.S.'s joint bank account(s), which largely consisted of a substantial amount of his earnings.

217. As a direct and proximate result of Defendants' fraud, Plaintiff has suffered damages as alleged herein and in an amount to be proven at trial, but not less than $722,000.

218. Defendants acted with oppression, fraud, and malice at all relevant times, as they knew that their representations and treatments were not legitimate. On information and belief, Defendants intended to and did cause injury to Plaintiff and engaged in despicable conduct with a willful and conscious disregard for the rights of others, subjecting Plaintiff to cruel and unjust hardship.

219. Plaintiff is entitled to compensatory damages, attorneys' fees and costs, interest, punitive and exemplary damages, and other legal and equitable remedies.

**THIRD CLAIM FOR RELIEF**

**(Constructive Fraud)**

**(Against All Defendants)**

220. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

221. Plaintiff and Defendants had a confidential relationship because VP and AUM gained the confidence and trust of Plaintiff and purported to act and advise with

the interest of Plaintiff and his young daughters in mind.

222. Plaintiff placed his trust and confidence in the integrity and fidelity of VP and AUM given his family members' positive experience with them and entrusted Defendants with the care and wellbeing of his young daughters.

223. Defendants breached their duty to Plaintiff created by this confidential relationship by repeatedly misleading and deceiving Plaintiff to his prejudice and detriment. Defendants breached their duty of care by creating false accusations and diagnoses for the purposes of gaining control over the girls and forcing Plaintiff to pay exorbitant sums for their treatment.

224. As a direct and proximate result of Defendants' breach of their duty created by this confidential relationship and the trust Plaintiff had in them, Plaintiff has suffered damages in an amount to be proven at trial, but not less than $722,000.

225. Defendants also breached the duty to Plaintiff created by the confidential relationship by advertising and offering for sale products, services, and treatments that they claim have healing, sacred, divine, or therapeutic properties that they do not have and which Defendants know or reasonably should know they lack.

226. Defendants manipulated Plaintiff into making exorbitant payments with the intent to deceive and defraud him.

227. Plaintiff reasonably, foreseeably, and detrimentally relied on Defendants' representations and did so under duress that was created by Defendants.

228. As a proximate result of Defendants' misrepresentations and breach of duties, Plaintiff has suffered and continues to suffer general and special damages in amounts to be determined according to proof at trial.

229. Furthermore, Defendants' misrepresentations constitute acts of oppression, fraud, and/or malice, and thus give rise to punitive damages pursuant to Section 3294 of the Civil Code.

Glaser Weil

**FOURTH CLAIM FOR RELIEF**

**(Negligent Supervision)**

**(Against All Defendants)**

230. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

231. At all relevant times, VP was the leader of AUM and supervised agents of the enterprise whom she recruited, including but not limited to S.S., SIL, BIL, Gautam Kumaran, Richard Walters, Nancy Nardona, Marc, and Belinda.

232. On information and belief, various cult Members and agents of AUM were and are responsible for the care of Plaintiff's daughters. They fall under the structure of the AUM cult and VP's leadership.

233. VP owed a duty to Plaintiff and his daughters to exercise reasonable care in the supervision and oversight of its officers, including the agents named above, especially in regard to treating and taking care of Plaintiff's minor children.

234. Defendants had a special relationship with K.D. and M.D., given that VP and her AUM associates and Members became their caretakers and/or guardians once Plaintiff entrusted the children in their care when he allowed them to move to California. Defendants therefore had an affirmative duty to take reasonable steps to protect K.D. and M.D. from foreseeable risks of harm.

235. Despite having an affirmative duty to take reasonable steps to protect the children from foreseeable risks of harm, AUM's agents acted outrageously by holding the children captive in the cult, brainwashing them, implanting false memories of abuse and trauma, using his family to make false and slanderous accusations of abuse in police reports, CPS reports, court filings, and communications to his employer, friends, and acquaintances, threatening more false and defamatory accusations to his temple, and preventing the children from seeing or contacting Plaintiff, which has caused him extreme emotional distress.

236. As a result of Defendants' conduct, Plaintiff has suffered extreme and

severe emotional distress.

237. Defendants knew or should have known that their treatment methods were not safe or in the best interests of the minors, and that separating children from their families and implanting false memories of abuse and trauma would have detrimental effects on both the children and parents.

238. VP failed to supervise AUM'S agents or implement reasonable safeguards to prevent the mistreatment of minors in their care.

239. As alleged herein, VP was aware and on notice that she and her supervisees were likely to cause harm before the harm occurred, given that AUM Members had a history of isolating people, including children, from their families, resulting in harm.

240. As a result of VP's negligent failure to supervise AUM's agents, Plaintiff suffered substantial financial damages.

241. Plaintiff is entitled to compensatory damages resulting from VP and AUM's negligent conduct.

242. As direct and legal result of Defendants' above-described intended acts and conduct, Plaintiff has suffered and continues to suffer great psychological and emotional distress, as well as feelings of embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and will continue to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has and will continue to sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

243. The children will require extensive psychological counseling, therapy, and treatment to recover from their trauma and manipulation by Defendants once they are eventually freed from the cult. Defendants should be held liable to cover the costs of their therapy to help them recover from the trauma inflicted on them by Defendants.

**FIFTH CLAIM FOR RELIEF**

**(Conversion)**

**(Against All Defendants)**

244. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

245. At all relevant times, Plaintiff was the owner and rightful possessor of the funds that were sent to Defendants for purposes of treating his daughters.

246. Defendants advertised and offered for sale products, services, and treatments that they claim have healing, sacred, divine, or therapeutic properties that they do not have and which Defendants know or reasonably should know they lack.

247. Defendants intentionally and wrongfully exercised control over Plaintiff's funds transmitted to them in exchange for these falsely-described products, services, and treatments without the knowing, authorized, and informed consent of Plaintiff.

248. As a direct and proximate result of Defendants' unauthorized use of the funds obtained through false pretenses, Plaintiff has suffered damages in an amount to be proven at trial, but not less than $722,000.

249. Defendants' conduct was willful, fraudulent, and malicious, and carried out with conscious disregard for the rights of Plaintiff, entitling Plaintiff to an award of punitive and exemplary damages pursuant to Cal. Civ. Code § 3294.

**SIXTH CLAIM FOR RELIEF**

**(Theft by False Pretenses)**

**(Against All Defendants)**

250. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

251. California Penal Code § 496(c) reads: "Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees." Section 496(a) makes receiving, buying, or withholding property "that

has been obtained in any manner constituting theft" an act punishable by imprisonment. In turn, section 496(c), applies that statute in civil cases. (*Bell v. Feibush* (2013) 212 Cal.App.4th 1041.)

252. The "theft" referred to in Section 496 includes theft by false pretenses (i.e., the consensual but fraudulent acquisition or retention of property from its owner). (*See* Cal. Pen. Code, § 484(a).)

253. Over the course of the last three years, Defendants have retained, and refused to return, over $722,000 fraudulently obtained from Plaintiff.

254. Defendants continue to wrongfully withhold the money from Plaintiff.

255. As a result of Defendants' wrongful acts and omissions, Plaintiff has suffered damages.

256. In addition, California Penal Code § 496(c) provides for treble damages and attorneys' fees and costs.

257. Defendants are liable to Plaintiff for punitive damages for their acts of malice, oppression and fraud as those words are used and defined in Civil Code § 3294.

**SEVENTH CLAIM FOR RELIEF**

**(Unfair Competition – Violation of Cal. Bus & Prof. Code §§ 17200 *et seq.*)**

**(Against All Defendants)**

258. Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

259. Defendants have engaged in and continue to engage in, have aided and abetted and continue to aid and abet, and have conspired to and continue to conspire to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200 *et seq*., in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

260. The business acts and practices engaged in by Defendants that violate the Unfair Competition Law include making fraudulent representations regarding their

services and qualifications in order to extort exorbitant payment and manipulating parents to relinquish control and custody of their minor children under the guise of providing mental health treatment.

261. Defendants advertise and offer for sale products, services, and treatments that they claim have healing, sacred, divine, or therapeutic properties that they do not have and which Defendants know or reasonably should know they lack.

262. These business acts and practice are unlawful because they violate laws including:

a. RICO;
b. False pretenses; and
c. Federal and state laws and regulations, including those precluding fraud and misrepresentations.

263. These business acts and practices are unfair in that Defendants have caused Plaintiff to relinquish his parental control over his young daughters as well as to pay hundreds of thousands of dollars under the guise of mental and physical care for his daughters. These acts and practices violate public policy and are also immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers like Plaintiff.

264. These business acts and practices are fraudulent in that Defendants' untrue and misleading representations and omissions regarding the holistic care they provide are likely to, and in fact have, deceived Plaintiff and other members of the public.

265. As a result of Defendants' unlawful, unfair, and fraudulent business acts and practices, Plaintiff is entitled to an order, pursuant to Cal. Bus & Prof. Code § 17203, enjoining such future conduct and such other orders and judgments that may be necessary to provide restitutionary disgorgement of Defendants' ill-gotten gains and to restore to Plaintiff all monies paid as a result of Defendants' conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and



Glaser Weil
3156070

respectfully requests the following relief:

1. For orders preliminarily and permanently enjoining Defendants from continuing to engage in their unfair, false, and fraudulent business practices;

2. For orders preliminarily and permanently enjoining Defendants from maintaining custody or control over Plaintiff's daughters and from having any further contact or communication with Plaintiff or his daughters, either directly or indirectly;

3. For his minor child's immediate return to Plaintiff's custody;

4. For past, present, and future general and compensatory damages in an amount to be determined at trial;

5. For past, present, and future special damages, including but not limited to past, present, and future lost earnings, emotional distress damages, rehabilitation expenses for his children, economic and other damages in an amount to be determined at trial;

6. For statutory damages including, but not limited to, attorneys' fees incurred by Plaintiff in this action;

7. For costs of suit;

8. For pre- and post-judgment interest to the extent allowable by law;

9. For attorneys' fees to the extent allowable by law;

10. For treble damages to the extent allowable by law under 18 U.S.C. 1964(c) and Cal. Pen. Code § 496(c);

11. For exemplary and punitive damages in an amount to be determined at trial;

12. For restitution and disgorgement; and

13. For such other further relief as the court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury in this case on all issues so triable.



Glaser Weil

DATED: February 9, 2026

Respectfully submitted,

GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP

By: */s/ Elizabeth A. Sperling*
Elizabeth A. Sperling
Alina Gatto
Attorneys for Plaintiff Varadajaran
Dwarakanath